1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA MARQUEZ, | ) 1:05-CV-01139 LJO GSA |
| | ) |
| | ) |
| Plaintiff, | ) FINDINGS AND RECOMMENDATION |
| | ) REGARDING PLAINTIFF'S |
| v. | ) SOCIAL SECURITY COMPLAINT |
| | ) (Document 27) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

17

## **BACKGROUND**

18

19

20

21

22

23

Plaintiff Gina Marquez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge, for findings and recommendation to the District Court.

24

## **FACTS AND PRIOR PROCEEDINGS**[1]

25

26

On October 25, 2000, Plaintiff filed an application for SSI benefits.  AR 191, 192-195. She alleged disability since July 10, 1992, due to "alopecia aerota" causing severe emotional

27

28

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

distress and depression.  AR 192, 223.  After being denied both initially and upon

reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR

181-184, 186-189, 190.  On May 23, 2002, ALJ Bert Hoffman held a hearing.  AR 287-328.

ALJ Hoffman denied benefits on July 10, 2002.  AR 132-140.  Plaintiff requested review, and the

Appeals Council granted the request and remanded the case to an ALJ for further proceedings.

AR 141-142, 143-146.

On November 12, 2003, and February 17, 2004, ALJ Hoffman held hearings.  AR 329-

354, 355-367.  ALJ Hoffman denied benefits on April 14, 2004.  AR 52-62.  Plaintiff again

requested review.  The Appeals Council granted her request, vacated the ALJ's decision and

remanded the case for further proceedings.  AR 63-66, 67-68.

On February 24, 2005, ALJ Patricia Flierl held a hearing.  AR 368-402.  On March 25,

2005, ALJ Flierl denied benefits.  AR 12-22.  Plaintiff requested further review.  AR 10-10.  On

July 5, 2005, the Appeals Council denied the request for review.  AR 7-9.

Hearing Testimony

On February 24, 2005, ALJ Flierl held a hearing in Fresno, California.  AR 368-402.

Plaintiff appeared with her attorney, Robert Ishikawa.  AR 370.  Vocational expert ("VE")

Thomas Dachelet also appeared and testified.  AR 370, 396-401.

Plaintiff was 34 at the time of the hearing.  AR 370.  She was born on August 3, 1970.

AR 370.  She completed the twelfth grade.  AR 371.  She worked in a summer school program

during her high school years.  AR 371.

Plaintiff testified that she goes to mental health treatment at Dinuba Mental Health in

Tulare County.  AR 371-372.  The number of times she goes varies, but she goes twice a month,

every two weeks.  AR 372.  She gets counseling with her daily life.  AR 372.  She talks with a

therapist, Esmeralda Leon, about her life.  AR 372.  It is one-on-one.  AR 372.  She also has seen

Dr. Ronald Burke.  AR 372.  He prescribes medication for her.  AR 372.  She is taking Risperdal

and Paxil.  AR 372.  She also takes Ambien because she does not get good rest and Prilosec

OTC. AR 372.

1    Plaintiff testified that she started going to counseling sessions in about March of 2004.

2  AR 373.  She did not have any counseling or see any psychiatrists prior to March of 2004.  AR

3  373.  She did not know that she could do that.  AR 373.  Her doctor finally gave her a referral.

4  AR 373.  She went to Tulare County in 2002 or 2003.  AR 373.  She did not go anymore,

5  because they did not know who she was on a return visit.  AR 373-374.

6    Plaintiff testified that she goes to her counseling sessions for panic attacks.  AR 374.  She

7  has panic attacks two or three times a week.  AR 374.  When she has a panic attack, she feels like

8  she wants to jump out of her skin.  AR 374.  She starts sweating and gets "really scared."  AR

9  374.  She gets short of breath and her heart races.  AR 374.  It sometimes feels like she is going

10 to have a heart attack.  AR 374.  She does not know what causes the panic attacks.  AR 375.  She

11 guesses it has a lot to do with the way she feels about herself.  AR 375.  She is "real insecure."

12 AR 375.  She has a disease and loses her hair, so she is self conscious.  AR 375.  Every day she

13 has to get up and paint her hair on, which is why she wears a band.  AR 375.  Every day she feels

14 very low self-esteem.  AR 375.  She does not like to be around people that she does not know.

15 AR 375.  She has to "hand up clothes a certain way," have her can foods a certain way, have her

16 laundry a certain way, and put her spoons a certain way.  AR 375.  She catches herself doing it

17 one hour a day.  AR 375.  The doctor diagnosed her as having a compulsive disorder.  AR 375.

18 She spends a lot of time during the day straightening things out.  AR 375-376.

19   Plaintiff testified that she socializes with her family.  She cannot really socialize with

20 strangers.  AR 376.  She has a panic attack.  AR 376.  She distances herself from people.  If she

21 goes anywhere, she has to take somebody with her or somebody takes her so she can "avoid if

22 somebody's going to talk" to her.  AR 376.  She can talk to her family.  AR 376.  She has a

23 couple of life long friends.  AR 376.  She just likes her own little circle.  AR 376.  She gets

24 aggressive with people if they are staring at her because of her hair.  AR 376.  She does not get

25 aggressive with people very often, because she tries to put her head down and not look at people

26 or make eye contact.  AR 376-377.  She does not go outside of her house very often.  AR 377.

27 She is "mostly inside."  AR 377.  She walks next door to her in-law's house.  AR 377.

28

Plaintiff testified that she goes to the store when she has to go.  AR 377.  She goes maybe once a week.  AR 377.  She does not go alone.  AR 377.  She always takes someone with her.  AR 377.  She does not go to her mental health appointments alone.  Her uncle, her boyfriend, Jose, or her mom will drive her.  AR 377-378.  They stay in the lobby or waiting room.  AR 378.  She does not go anywhere else.  AR 378.  She was going to her son's football games, but those are over.  AR 378.  She stays on the outskirts, behind the bleachers, away from people.  AR 378.  Her sister will stand with her.  AR 378.

Plaintiff testified that she worries a lot.  AR 378.  They prescribed her Ambien because she was not getting good rest.  AR 378.  She can sleep for a little with the Ambien and then she will get up again.  AR 378.

Plaintiff testified that she hears voices "[o]nce in awhile."  AR 378-379.  She hears them maybe twice a month.  AR 379.  She hears different things--"look at your head," "you're bald"--just ugly things.  AR 379.  She will be fine for awhile and then they will start up again.  AR 379.

Plaintiff testified that she has problems concentrating.  AR 379.  She gets a lot of help with her housework from her second oldest son.  AR 379.  The father helps her out a lot.  AR 379.  She gets a lot of help.  AR 379.

Plaintiff testified that she has crying bouts all the time.  AR 379.  She does not like anybody to see her cry so she will go into the restroom.  AR 379.  She does not like her kids to see her cry.  AR 379.  It happens five times a week.  AR 379.  It lasts for five minutes and then she is better "for a little while."  AR 380.

Plaintiff testified that she recently broke her foot.  AR 380.  She was in a hurry and was not paying attention.  AR 380.  She slipped in the water walking out to the car.  AR 380.  She was going to her son's high school in order to sign him out of school.  AR 380.  He now resides with his father.  AR 380.  She had to go to each classroom to sign him out, but she never made it.  AR 380.  He finally got out of the school.  AR 381.  Her mother drove her to the school he transferred to and gave them the papers.  AR 381.  Plaintiff picked up the first papers with her uncle.  AR 381.  He went with her to help her because she gets disoriented.  AR 381.  Her uncle

was driving.  AR 382.  He went with her to the office and then to the career center.  AR 383.  She did not go into the second school.  AR 383.

Plaintiff testified that she has four children living with her now.  AR 383.  They are 11, 9, 6 and 2 years old.  AR 383.  Jose, their father, also lives with her.  AR 383.

Plaintiff testified that she has not driven in a couple of months.  AR 383.  She does not want to drive.  AR 383-384.  She used to drive to her grandmother's house or to the grocery store.  AR 384.  She used to drive to the store one time a week.  AR 384.  Her 11-year-old son goes with her and helps.  AR 384-385.  She has a valid California driver's license.  AR 385.  She had to get it because she got a ticket for no license.  AR 385.  She also drove to her mother's house in Dinuba, about 8 miles.  AR 386.  She does not go by herself.  AR 386.  Her son goes with her because she does not like to go anywhere by herself.  AR 386.  She goes to her mother's or grandmother's in the afternoon at 2:00 p.m.  AR 386.  Her son gets out of school at 2:20 p.m.  AR 387.  If it is a weekday, they will go at 4:00 p.m.  AR 387.  It varies.  AR 387.  When her oldest son was living with her grandmother they would go over there quite a bit at 4:00 or 5:00 when he was out of school.  AR 387.  Her sister or her mom take her to her grandmother's now.  AR 387.  She also goes to her doctor at the clinic.  AR 388.  She gets dropped off and picked up by Jose, his mom or her sister.  AR 388.  She was driving there, too, when her kids were sick.  AR 388.  Jose brought her to the hearing.  AR 388.

Plaintiff testified that she did not have any bad effects from the medication that she is taking.  AR 388.  She takes medications every day.  AR 388.

Plaintiff testified that she and her son do the cooking at home.  AR 389.  Everybody helps.  AR 389.  Her son helps her cook because he offers.  AR 389.  If she gets disoriented, he will offer to help.  AR 389.  She and her son do laundry and clean the house.  AR 389-390.  He is her oldest child at home.  AR 390.  He does more than the other ones.  AR 390.  They vacuum.  AR 390.  She can vacuum, but she gives them chores to do.  AR 390.

Plaintiff testified that she does most of the work in her house.  AR 390-391.  She does most of the cooking, cleaning and laundry.  AR 391.  Her son goes to school, but when they get home from school they help out.  AR 391.  The chores the children have are throwing out the

1  trash, the dishes, putting the laundry away.  AR 391.  She checks the laundry and hangs up the

2  clothes.  AR 391.  She mainly cooks dinner.  AR 394.  Their father makes breakfast and they eat

3  lunch at school.  AR 394.  She fixes her own lunch.  AR 394.

4        The ALJ remarked that Plaintiff's hair "looks perfectly fine...and normal."  AR 394.

5  Plaintiff testified that she is self-conscious about it.  AR 395.  She has it covered with a black

6  band.  AR 395.  She does not like to have a wig.  AR 395.  She feels suffocated.  AR 395.  She

7  cannot wear jewelry.  AR 395.

8        VE Thomas Dachelet also testified.  AR 396-397.  The VE testified that Plaintiff had no

9  past work.  AR 397.  The ALJ asked the VE to assume a hypothetical individual with the same

10 age and education as Plaintiff with no work experience.  AR 397.  The ALJ also asked the VE to

11 assume a residual functional capacity with no exertional limitations, but limited to simple and

12 repetitive work with limited public contact.  AR 397.  The VE testified that there are jobs in the

13 regional or national economy that such an individual could do.  AR 397.  The individual could do

14 jobs that are called packers and packagers.  AR 397.  There are a total of 2,417 persons employed

15 in California doing that type of work and ten times that in the U.S.  AR 397-398.  DOT's would

16 be 920.687-134 at the medium level, 920.687-018 at the light level, and 559.683-014 at the

17 sedentary level .  AR 398.  The VE testified that other jobs include a group that is called cleaners

18 of vehicles and equipment, with 170 jobs at the heavy level, 739 at the medium level and 270 at

19 the light level in California.  AR 398.  The VE also testified that there would be another job

20 group entitled packaging and filling machine operators and tenders with California numbers of

21 139 at the heavy level, 209 at the medium level and 869 at the light level.  AR 399.  The numbers

22 would be times 10 for the U.S.  AR 399.  The DOT number is 529.685-162.  AR 399.

23       For the second hypothetical, the ALJ asked the VE to assume an individual with full

24 exertional capacity, simple and repetitive, and unable to relate appropriately to other individuals.

25 AR 399.  The VE testified there would be no jobs and the world of work is closed.  AR 400.

26       For the third hypothetical, Plaintiff's attorney asked the VE to assume the claimant would

27 be able to understand, carry out and remember simple instructions, but would have difficulty

28 responding appropriately to co-workers, supervisors and the public in a routine work setting.  AR

400. She would have difficulty responding to usual work situations or stressors in an appropriate fashion and difficulty dealing with changes in a routine work setting. AR 400. She also would be unable to work an eight hour workday, attend work regularly and perform work duties consistently without special or additional supervision. AR 400. The VE testified that there is no past work and the world of work is closed. AR 401.

Medical Evidence

Treatment notes dated March 30, 1999, indicated that Plaintiff was nervous. AR 269. She was prescribed Xanax. AR 269. On April 13, 1999, Plaintiff was prescribed a Xanax refill. AR 269. She also was referred to Dr. Villard because her "[h]air falls out." AR 269.

On April 28, 1999, Christopher L. Villard, M.D., a Diplomate of the American Board of Dermatology, saw Plaintiff for evaluation and treatment of scalp hair loss. AR 236. Dr. Villard suspected that Plaintiff had extensive alopecia areata. AR 236. He prescribed a course of Prednisone. AR 236. Dr. Villard also completed a medical report for the county Welfare-to-Work program. AR 236. Dr. Villard opined that Plaintiff was expected to be released for work or training in 6 weeks. AR 272. Dr. Villard listed Plaintiff's diagnosis as "[e]xtensive alopecia areata causing severe emotional distress." AR 272.

On October 16, 1999, Dr. Wileman completed a medical report for the county welfare department. AR 271. Dr. Wileman opined that Plaintiff had a physical or mental incapacity that prevented or substantially reduced her ability to engage in work, training and/or provide necessary care for her children. AR 271. Dr. Wileman opined this was part-time. AR 271. AR 271. Dr. Wileman indicated that Plaintiff had been diagnosed with nervousness and gastritis since 1988 and was permanent. AR 271. He described Plaintiff's limitations as emotionally upset. AR 271. Dr. Wileman further opined that Plaintiff's physical/mental condition did not prevent or substantially reduce her ability to provide necessary care for the children in the home. AR 271.

On January 14, 2000, Plaintiff underwent x-rays at Alta District Hospital. AR 261. The x-rays revealed a nondisplaced fracture of the distal radius. AR 261. Plaintiff complained of punching a wall the previous day. AR 261.

7

1     Apparent treatment notes from January 18, 2000, included information that Plaintiff was

2  "mad at world" and "hit wall" with feet. AR 260. She was prescribed Paxil. AR 260.

3     On December 2, 2000, Jagvinder Singh, M.D., of mdsi Physician Group, conducted a

4  comprehensive internal medicine evaluation of Plaintiff. AR 237. Plaintiff complained of

5  fatigue, hair loss, irritability and anxiety attacks. AR 237. On physical examination, Plaintiff

6  had hair loss on all parts of her head. AR 239. Dr. Singh diagnosed her with panic disorder and

7  alopecia areata. AR 239. Dr. Singh opined that Plaintiff had no physical limitations. AR 210.

8  She could stand for six hours and sit for eight hours in an eight-hour workday. AR 210. She did

9  not require an assistive device. AR 210. She could lift and carry 50 pounds occasionally and 20

10  pounds frequently. AR 210. She had no postural or manipulate restrictions, but should avoid

11  working at heights and at extremes of temperatures. AR 210. Dr. Singh recommended that she

12  be examined further by a psychiatrist and a dermatologist for her panic attacks and hair loss. AR

13  210.

14     On December 28, 2000, Michael S. Barnett, M.D., a Board Certified Psychiatrist,

15  completed a psychiatric evaluation of Plaintiff at the request of the Department of Social

16  Services. AR 241-243. Plaintiff complained that she did not like to be around people. AR 241.

17  She reported getting depressed, having panic attacks and having difficulty falling asleep. AR

18  241. She had decreased energy, poor concentration and forgetfulness. AR 241. On mental

19  status examination, Plaintiff was tearful, anxious and in mild psychic distress. AR 242. Her

20  mood was depressed and her affect was blunted. AR 242. Dr. Barnett thought that Plaintiff's

21  panic attacks preceded her psychotic symptoms. AR 242. He indicated that Plaintiff needed to

22  be treated with a sedating antianxiolytic and antidepressant medication and a neuroleptic

23  medication and, if she were treated with the medicines, "she would most likely be able to work."

24  AR 242.

25     Dr. Barnett diagnosed Plaintiff with Panic Attacks with Agoraphobia, Depressive

26  Disorder, NOS, and Psychotic Disorder, NOS, and assigned her a Global Assessment of

27  Functioning ("GAF") of 58. AR 243. He opined that Plaintiff would be able to understand, carry

28  out and remember simple instructions. AR 243. She would have difficulty responding

appropriately to co-workers, supervisors and the public in a routine work setting.  AR 243.  She also would have difficulty responding to usual work situations or stressors in an appropriate fashion and difficulty dealing with changes in a routine work setting.  AR 243.  Dr. Barnett further opined that Plaintiff would be unable to work an eight-hour day, to attend work regularly and to perform work duties consistently without special or additional supervision.  AR 243.

On February 13, 2001, state agency consultant Allen Middleton, Ph.D., completed a Psychiatric Review Technique form.  AR 245-249.  Dr. Middleton opined that Plaintiff had a psychotic disorder nos by history and an anxiety-related disorder of panic.  AR 246-247.  She had mild restriction of activities of daily living and mild difficulties in maintaining social functioning.  AR 248.  She also had mild to moderate difficulties in maintaining concentration, persistence or pace.  AR 248.

Additionally, on February 13, 2001, Dr. Middleton completed a Mental Residual Functional Capacity Assessment form.  AR 252-254.  Dr. Middleton opined that Plaintiff was moderately limited in the ability to understand and remember detailed instructions and moderately limited in the ability to carry out detailed instructions.  AR 252.  She also was moderately limited in the ability to interact appropriately with the general public and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  AR 253.  Dr. Middleton was not able to rate Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors, but opined that she should have limited close contact with coworkers and the public.  AR 253-254.  Dr. Middleton also opined that she was capable of adapting to a routine job.  AR 254.  On February 13, 2001, state agency psychiatrist Archimedes Garcia, M.D., reviewed and affirmed the assessment.  AR 254.

On October 23, 2001, Plaintiff sought treatment from Benito Rivas, PAC, for complaints of mood swings, anxiety and insomnia.   AR 285.  PAC Rivas diagnosed Plaintiff with anxiety and prescribed Zoloft.  AR 285.

In November 2001, Plaintiff sought follow-up treatment for insomnia.  AR 284.  She reported feeling "much better in moods."  AR 284.  She was diagnosed with depression/anxiety and insomnia.  AR 284.  Her Zoloft was increased and she was prescribed Ambien.  AR 284.

On December 26, 2001, Plaintiff sought follow-up treatment for anxiety.  AR 279.  Plaintiff reported that she quit taking Zoloft because it did not help and made her feel bad.  AR 279.  She also did not take Ambien because it was not covered.  AR 279.  She reported that she did not tolerate being around other people, in public or in enclosed spaces.  AR 279.  She also indicated that the only medicine to maker her better was Xanax.  AR 279.  She was diagnosed with social phobia and depression.  AR 279.  She was prescribed a trial of Doxepin, but refused a mental health referral.  AR 279.

On December 26, 2001, Benito Rivas, PAC, completed a medical report for county Welfare-to-Work activities.  AR 280.  PAC Rivas indicated that Plaintiff was unable to be released for work or training for 9 months due to GAD, social phobia, insomnia and depression.  AR 280.  PAC Rivas opined that Plaintiff's prognosis was "good."  AR 280.

On January 23, 2002, Plaintiff received follow-up treatment for anxiety and insomnia.  AR 278.  Plaintiff reported feeling better, but was not ready to consider mental health counseling.  AR 278.  She was diagnosed with anxiety and insomnia and was to continue with Doxepin.  AR 278.

On February 20, 2002, Plaintiff sought follow-up treatment for depression.  AR 277.  Treatment notes indicated that Plaintiff still felt depressed, with crying and worrying, but without suicidal thoughts.  AR 277.  She was diagnosed with depression, hypertension and hyperlipidemia and prescribed Doxepin.  AR 277.  Plaintiff reportedly refused mental health due to a bad experience.  AR 277.

On May 3, 2002, Plaintiff sought an increase in her Doxepin.  AR 275.  Plaintiff reported she had increased pressures at home and she was very nervous about her disability interview.  AR 275.  She also reported increased hair loss.  AR 275.  She was diagnosed with depression/anxiety, alopecia areata and hypertension with fair control.  AR 275.

On May 30, 2002, Plaintiff sought treatment from PAC Rivas for complaints of occasional chest pain when stressed and the weather is hot.  AR 163.  On physical examination, her cardiovascular system was normal.  AR 163.  She reportedly felt nervous.  AR 163.  PAC Rivas diagnosed her with hypertension.  AR 163.

1   On May 23, 2003, Plaintiff sought treatment for complaints of being nervous and dizzy.

2   AR 96.  She was "not taking any meds."  AR 96.  She was assessed with anxiety and insomnia

3   and was prescribed Ativan and Paxil.  AR 96.

4   On May 30, 2003, Plaintiff had a check up and reported that her "meds are helping her."

5   AR 95.  She had no complaints.  AR 95.  She was assessed with anxiety and insomnia.  AR 95.

6   On August 15, 2003, William A. Spindell, Ph.D., FACFE, FABMP, completed a

7   consultative psychological evaluation of Plaintiff.  AR 155.  On examination, Plaintiff had a flat

8   affect and was often depressed.  AR 156.  She was oriented to time, person, place and purpose of

9   the evaluation.  AR 156.  Dr. Spindell reported that Plaintiff made very little effort on all of the

10  tests.  AR 156.  The Bender Visual Motor Gestalt revealed no hand eye coordination difficulties,

11  but reflected a significant lack of motivation and involvement in the evaluation.  AR 156.  The

12  Wechsler Adult Intelligence Scale--III yielded a verbal IQ of 74, a performance IQ of 72 and a

13  full scale IQ of 70.  AR 157.  Dr. Spindell diagnosed Plaintiff with adjustment disorder of adult

14  life with mixed emotional symptoms.  AR 157.  He opined that although Plaintiff had symptoms

15  for a considerable length of time, she did not fit all of the criteria of a major depression.  AR 157.

16  Dr. Spindell noted that Plaintiff drove and could handle most of her activities of daily living.  AR

17  157.  He further opined that Plaintiff "could address several aspects of the labor market in simple

18  entry-level jobs...[o]f course depending on her psychiatric state."  AR 157.  Plaintiff did "not

19  appear very motivated to want to work."  AR 157.

20  Dr. Spindell also completed a MSS Statement on Work Capacities form.  AR 161.  He

21  opined that Plaintiff could not perform detailed and complex tasks versus simple and repetitive

22  tasks and she had episodes of decompensation.  AR 161.

23  On January 29, 2004, Plaintiff sought medications.  AR 92.  She was diagnosed with

24  anxiety and depression and prescribed an increased dosage of Paxil and Risperdal.  AR 92.

25  On March 3, 2004, Rita Valenzuela Lavelle, a MSW Intern at Tulare County Mental

26  Health, completed a mental health services intake assessment of Plaintiff.  AR 122-130, 131.

27  Plaintiff reported past and recent suicidal thoughts.  AR 122.  She indicated that she had been

28  depressed for the last 5-6 years due to her alopecia areota, a hereditary hair loss condition.  AR

123.  She had anxiety attacks, sleeplessness and an inability to eat.  AR 123.  When going out in public, she indicated that her heart races, she sweats and she gets sweaty palms.  AR 123.  She also confronted people that she felt were staring at her.  AR 123.  When depressed, she reported that she binge eats.  AR 123.  She also reported low self-esteem.  AR 123.

With regard to her current functioning, Plaintiff described that she gets up daily, sends her children to school and cares for her one-year-old child.  AR 123.  She reported socializing only with family and a few friends from childhood.  AR 123.  On mental status exam, Plaintiff was obese with a slumped posture.  AR 127.  She was cooperative and friendly.  AR 127.  She was oriented to person, place, time and situation.  AR 127.  She had a blunt intensity with a sad, depressed, shameful, anxious mood.  AR 128.  She denied hallucinations.  AR 128.  She had coherent, logical thought process.  AR 128.  Her thought content included ruminations and phobias and her intellectual functioning was above average.  AR 128.  MSW Intern Lavelle gave Plaintiff a primary diagnosis of Panic Disorder with Agoraphobia and a secondary diagnosis of Dysthymic Disorder.  AR 130.  Mental health professional Rosie Zepeda, ASW, reviewed/approved the intake assessment.  AR 130.

On April 7, 2004, MSW Intern Lavelle completed another intake assessment of Plaintiff.  AR 120.  Plaintiff reported that her depression had worsened since the first interview.  AR 120.  She cried daily because of her feelings of shame and self-hatred.  AR 120.  Plaintiff also reported that her anxiety attacks had worsened and her anxiety about going out in public caused her to sweat, breathe heavily and rapidly, and lash out at other people.  AR 120.  MSW Intern Lavelle planned to present Plaintiff's case before a clinical team for diagnosis and a medical necessity determination.  AR 120.

On April 15, 2004, MSW Intern Lavelle presented Plaintiff's mental health case to the Clinical Services Team.  AR 119.  Plaintiff was given a primary diagnosis of Panic Disorder with Agoraphobia and a secondary diagnosis of Dysthymic Disorder.  AR 119.  Plaintiff's treatment plan included referral to a rehabilitation group, case management, medication support services and a psychiatric evaluation.  AR 119.

1    On May 5, 2004, MSW Intern Lavelle met with Plaintiff to develop service and

2  coordination plans.  AR 118.  Plaintiff was to be referred to individual and group therapy.  AR

3  118.  MSW Intern Lavelle noted that Plaintiff had an upcoming evaluation with Dr. Burke.  AR

4  118.

5    On June 22, 2004, Randall J. Burke completed a psychiatric evaluation of Plaintiff at the

6  Dinuba Adult Clinic.  AR 116.  Plaintiff complained that she did not like to be around people.

7  AR 113.  Plaintiff also related a long-standing history of depression and anxiety symptoms from

8  her desire to not be around people.  AR 113.  She linked this desire to her alopecia areata, which

9  leads to bald spots.  AR 113.  She reported feeling nervous when meeting new people.  AR 113.

10  Plaintiff endorsed sporadic panic attacks, estimating she was having five per week.  AR 113.  She

11  denied frank paranoid symptoms, but reported a recent hallucinatory experience in which she

12  seemed to hear a voice saying "die...die."  AR 113-114.  Plaintiff also described obsessive

13  symptoms, such as canned foods needing to be lined up symmetrically and colored clothes being

14  with colored clothes.  AR 114.  Plaintiff estimated spending over one hour per day engaging in

15  obsessive behaviors.  AR 114.

16    On mental status exam, Plaintiff had no psychomotor agitation or retardation.  AR 115.

17  Her affect was stable, full, mildly anxious in early session, well related near end of session.  She

18  had no suicidal or homicidal ideation.  AR 115.  She had mild paranoid ideation and an

19  overvalued ideation relating to hair patches.  AR 115.  She had no formal thought disorder or

20  hallucinations.  AR 115.  She was alert and oriented with fair insight and judgment.  AR 115.

21    Dr. Burke diagnosed Plaintiff with body dysmorphic disorder, obsessive-compulsive

22  disorder and major depressive disorder recurrent moderate.  AR 115.  Dr. Burke assigned

23  Plaintiff a Global Assessment of Functioning ("GAF") of 57.  AR 115.  Plaintiff's treatment plan

24  included maximizing Paxil and individual therapy.  AR 116.

25    On July 27, 2004, Plaintiff sought medical treatment and reported no complaints.  AR 89.

26  Plaintiff related that she was under mental health care.  AR 89.  The provider diagnosed anxiety

27  and depression.  AR 89.

28

1      On August 17, 2004, Plaintiff sought treatment from Randall J. Burke, M.D., at the

2   Dinuba Adult Clinic.  AR 108-109.  Plaintiff reported no auditory or visual hallucinations, but

3   had been feeling overwhelmed and stressed.  AR 108.  She continued to worry about a bald spot

4   secondary to alopecia areata and had been having crying spells in a frustrating context.  AR 108.

5   Plaintiff estimated that she continued to engage in obsessive behaviors lasting at least one hour

6   per day.  AR 108.  On examination, Plaintiff's affect was stable, full, pleasant.  AR 108.  She had

7   no formal thought disorders or hallucinations during the interview.  AR 108.  She was alert and

8   oriented with fair insight and judgment.  AR 108.  Dr. Burke assessed Plaintiff with body

9   dysmorphic disorder, major depressive disorder (recurrent, moderate) and obsessive-compulsive

10  disorder.  AR 108.  Her treatment plan included an increase in Paxil for improved control of

11  depressive and obsessive symptoms, continuing Risperdal to augment antidepressant and for

12  treatment of soft antipsychotic symptoms, along with individual therapy.   AR 108-109.

13      On August 18, 2004, Plaintiff met with Esmeralda Leon, LCSW, at Tulare County Mental

14  Health.  AR 107.

15      On September 15, 2004, Plaintiff received individual treatment at Tulare County Mental

16  Health from Ms. Leon.  AR 105.  Treatment notes indicated that Plaintiff's focus was to increase

17  self-esteem and decrease depressive symptoms.  AR 105.

18      On September 29, 2004, Plaintiff again received individual treatment at Tulare County

19  Mental Health from Ms. Leon.  AR 104.  Plaintiff's focus was to decrease depressive symptoms

20  and increase functioning.  AR 104.

21      On October 19, 2004, Plaintiff sought a refill on her Paxil and Ambien.  AR 84.  She was

22  diagnosed with insomnia, anxiety and pharyngitis.  AR 84.  She was prescribed Risperdal,

23  Ambien and Paxil.  AR 84.  Plaintiff canceled her appointment at Tulare County Mental Health.

24  AR 103.

25      On October 26, 2004, Plaintiff received individual treatment at Tulare County Mental

26  Health from Ms. Leon.  AR 102.  Plaintiff's focus was to decrease symptoms of depression and

27  increase self-image and assertiveness skills.  AR 102.

28

On November 23, 2004, Plaintiff received individual treatment at Tulare County Mental Health from Esmeralda Leon. AR 100. Treatment notes indicated that Plaintiff's focus was to increase self-image in order to decrease symptoms of depression. AR 100.

On January 14, 2005, Plaintiff complained of a pinched nerve and headache. AR 81. She reported her anxiety was worse. AR 81. On January 19, 2005, Plaintiff underwent a cervical spine x-ray. AR 80. She had straightening of the normal cervical lordosis in the mid cervical spine, possibly secondary to spasm. AR 80. On January 26, 2005, she was diagnosed with cervical spasm. AR 79.

On January 19, 2005, Plaintiff received individual treatment at Tulare County Mental Health from Ms. Leon. AR 98. Plaintiff's focus was to increase functioning and decease negative self talk and anxiety. Plaintiff reported she was anxious due to family issues. AR 98.

ALJ's Findings

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. AR 21. The ALJ also found that Plaintiff's depression, social phobia, panic disorder and borderline intellectual functioning were severe impairments. AR 21. The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 21. The ALJ further found that Plaintiff had the residual functional capacity to work at all exertional levels and could perform simple repetitive tasks with limited public contact. AR 21. She did not have any past relevant work. Therefore, the ALJ used Section 204.00 of the Medical Vocational Guidelines as a framework to conclude that Plaintiff was not disabled. AR 22.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means more than a mere scintilla, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (internal quotation marks and citation omitted).  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the correct legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do his previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(g), 416.920 (a)-(g) (2006).  Applying the evaluation process in this case, the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since the alleged onset of disability; (2) has an impairment or a combination of impairments that is considered "severe" (depression, social phobia, panic disorder and borderline intellectual functioning) based on the requirements in the Regulations (20 C.F.R. § 416.920(c)); (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in Appendix 1 to Subpart P of Part 404; (4) does not have past relevant work; and (5) her non-

1  exertional limitations did not significantly compromise her ability to perform work at all

2  exertional levels.  AR 21-22.

3         In this case, Plaintiff argues that the ALJ erred by creating a less restrictive functional

4  capacity than that supported by the record and improperly evaluating and/or rejecting the

5  opinions of her treating physicians and the consultative psychiatric evaluator.

6                                          **DISCUSSION**

7  A.      Physician Opinions and Residual Functional Capacity Assessment

8         Plaintiff first argues that the ALJ's residual functional capacity ("RFC") assessment,

9  which restricted Plaintiff to limited public contact, did not address all portions of the opinion of

10  the consultative examiner, Michael S. Barnett, M.D.  Plaintiff next argues that the ALJ

11  improperly rejected the uncontradicted opinion of Dr. Barnett as well as the opinion of Plaintiff's

12  treating physicians.  The Court will address these arguments together as they bear on the weight

13  given to medical source opinions and the determination of Plaintiff's RFC.

14         RFC is an assessment of an individual's ability to do sustained work-related physical and

15  mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a

16  week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment considers only functional

17  limitations and restrictions which result from an individual's medically determinable impairment

18  or combination of impairments.  SSR 96-8p.  Here, the ALJ found that Plaintiff retained the

19  residual functional capacity to perform work at all exertional levels and could perform simple

20  repetitive tasks with limited public contact.  AR 20.

21         In reaching the RFC determination, the ALJ considered the opinion of the consultative

22  psychiatric examiner, Dr. Barnett, dated December 28, 2000.  AR 241-243.  Plaintiff argues that

23  the ALJ did not consider all portions of Dr. Barnett's assessment and failed to assign substantial

24  weight to his opinion.  Cases in this circuit distinguish among the opinions of three types of

25  physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do

26  not treat the claimant (examining physicians); and (3) those who neither examine nor treat the

27  claimant (nonexamining physicians).  As a general rule, more weight should be given to the

28  opinion of a treating source than to the opinion of doctors who do not treat the claimant.  *Winans*

1   *v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).  At least where the treating doctor's opinion is not

2   contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.

3   *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991).  Even if the treating doctor's opinion is

4   contradicted by another doctor, the Commissioner may not reject this opinion without providing

5   "specific, legitimate reasons" supported by substantial evidence in the record for so doing.

6   *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

7         In turn, the opinion of an examining physician, such as Dr. Barnett, is entitled to greater

8   weight than the opinion of a non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4

9   (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984).  As is the case with the

10  opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons

11  for rejecting the uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at 506.

12  And like the opinion of a treating doctor, the opinion of an examining doctor, even if

13  contradicted by another doctor, can only be rejected for specific and legitimate reasons that are

14  supported by substantial evidence in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th

15  Cir. 1995).

16        In this case, the ALJ gave little weight to, or ignored, portions of the consultative

17  psychiatric evaluation completed by Dr. Barnett.  Dr. Barnett diagnosed Plaintiff with panic

18  attacks with agoraphobia, depressive disorder not otherwise specified, and psychotic disorder not

19  otherwise specified.  AR 243.  He indicated that Plaintiff needed to be treated with a sedating

20  antianxiolytic and antidepressant medication and a neuroleptic medication and, if she were

21  treated with these medications, "she would most likely be able to work."  AR 242.  Dr. Barnett

22  then opined that Plaintiff would be able to understand, carry out and remember simple

23  instructions, but would have difficulty responding appropriately to co-workers, supervisors and

24  the public in a routine work setting.  AR 243.  She also would have difficulty responding to usual

25  work situations or stressors in an appropriate fashion, difficulty dealing with changes in a routine

26  work setting and would be unable to work an eight-hour day, unable to attend work regularly and

27  unable to perform work duties consistently without special or additional supervision.  AR 243.

28

1    The ALJ gave weight to Dr. Barnett's conclusion that the claimant could understand,

2    remember and carry out simple instructions because it was "congruent with the results of the later

3    psychological evaluation and test results." AR 20. The record supports the ALJ's determination

4    and demonstrates that consultative psychologist William Spindell, M.D., administered cognitive

5    tests to Plaintiff in August 2003 and concluded she could not perform detailed and complex tasks

6    versus simple and repetitive tasks. AR 155, 161. However, the ALJ gave limited or little weight

7    to other portions of Dr. Barnett's assessment of Plaintiff's residual functional capacity. AR 17,

8    20.

9        First, the ALJ gave limited to weight to Dr. Barnett's opinion that Plaintiff would have

10   difficulty interacting with coworkers, supervisors and the public, but gave a restriction to work

11   with limited public contact to accommodate that portion of Dr. Barnett's opinion. AR 20.

12   Plaintiff appears to concede that the restriction offered by the ALJ "may address the issue of

13   Plaintiff's difficulty in interacting with coworkers, supervisors and the public." Plaintiff's

14   Opening Brief for Summary Judgment and/or Remand ("Plaintiff's Opening Brief"), at p. 7.

15   However, even the state agency physicians determined that Plaintiff was moderately limited in

16   the ability to interact appropriately with the general public and in the ability to get along with

17   coworkers or peers without distracting them or exhibiting behavioral extremes and she should

18   have limited close contact with coworkers and the public. AR 253-254.

19       Next, the ALJ gave little weight to Dr. Barnett's conclusion that the claimant would be

20   unable to work an eight-hour day, attend work regularly and perform work duties consistently

21   without special or additional supervision. AR 20. The ALJ discounted this portion of Dr.

22   Barnett's opinion because he was a one-time evaluator and was less able to evaluate Plaintiff's

23   long-term functional capacity. AR 20. In rejecting Dr. Barnett's opinion, the ALJ relied on the

24   opinion of consultative psychologist, Dr. William Spindell, and the non-examining state agency

25   physicians.

26       With regard to the assessment by Dr. Spindell, the record reflects that his opinion

27   regarding Plaintiff's ability to work was not inconsistent with Dr. Barnett's determination. Dr.

28   Spindell, a Ph.D., opined that Plaintiff "could address several aspects of the labor market in

19

1  simple entry-level jobs...[o]f course depending on her psychiatric state." AR 157. The ALJ did

2  not evaluate Dr. Spindell's determination that Plaintiff's ability to work depended *on her*

3  *psychiatric state*. The record reflects that Plaintiff's psychiatric evaluation by Dr. Barnett

4  resulted in a determination that Plaintiff had functional capacity limitations and she would be

5  unable to work an eight-hour day, would be unable to attend work regularly and would be unable

6  to perform work duties consistently without special or additional supervision. The record also

7  demonstrates that the opinion of Plaintiff's treating physician was not inconsistent with Dr.

8  Barnett's assessment. In October 1999, Plaintiff's treating physician, Dr. Wileman opined that

9  Plaintiff had a physical or mental incapacity that prevented or substantially reduced her ability to

10  engage in full-time work, training and/or provide necessary care for her children. AR 271. Dr.

11  Wileman further noted that Plaintiff's condition was permanent. AR 271. Although Dr.

12  Wileman rendered his opinion in a conclusory, check-the-box form, his limitation to part-time

13  ability is congruent with Dr. Barnett's functional determination that Plaintiff would be unable to

14  work an eight-hour day.[2]

15       As Dr. Spindell's assessment did not contradict that of Dr. Barnett, the ALJ's additional

16  reliance on the state agency physicians also is insufficient. In February 2001, Dr. Middleton, a

17  state agency psychologist, opined that Plaintiff was moderately limited in the ability to

18  understand and remember detailed instructions and moderately limited in the ability to carry out

19  detailed instructions. AR 252. She also was moderately limited in the ability to interact

20  appropriately with the general public and in the ability to get along with coworkers or peers

21  without distracting them or exhibiting behavioral extremes. AR 253. Dr. Middleton was not

22  able to rate Plaintiff's ability to accept instructions and respond appropriately to criticism from

23  supervisors, but concluded she should have limited close contact with coworkers and the public.

24  AR 253-254. State agency psychiatrist, Archimedes Garcia, M.D., reviewed and affirmed Dr.

25  Middleton's assessment of Plaintiff's functional capacity. AR 254. Plaintiff correctly notes,

26  however, that the opinion of a non-examining physician cannot, by itself, constitute substantial

27

28      [2]Insofar as Plaintiff contends that the opinions of Dr. Singh and Dr. Burke support Dr. Barnett's assessment, this argument is not instructive. The record demonstrates that neither Dr. Singh nor Dr. Burke rendered an opinion regarding Plaintiff's functional limitations.

1   evidence that justifies the rejection of the opinion of either an examining physician, such as Dr.

2   Barrett, or a treating physician.   *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1454.

3       Because the ALJ did not consider Dr. Spindell's indication that Plaintiff's ability to work

4   depended on her psychiatric state, and the opinions of the of the State Agency physicians alone

5   do not constitute substantial evidence, the ALJ erred by assigning little weight to that portion of

6   Dr. Barnett's assessment in which he determined that Plaintiff would be unable to work an eight-

7   hour day, would be unable to attend work regularly and would be unable to perform work duties

8   consistently without special or additional supervision.   The ALJ also erred by failing to consider

9   or discuss Dr. Barnett's conclusion that Plaintiff would have difficulty responding to usual work

10  situations or stressors in an appropriate fashion and difficulty dealing with changes in a routine

11  work setting.   Accordingly, the ALJ's RFC restriction to limited public contact, which does not

12  incorporate or address the limitations by Dr. Barnett, is unsupported by the record.

13  B.      Decision to Remand or Award Benefits

14      Section 405(g) of Title 42 of the United States Code provides: "the court shall have the

15  power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

16  or reversing the decision of the Commissioner of Social Security, with or without remanding the

17  cause for a rehearing."   In social security cases, the decision to remand to the Commissioner for

18  further proceedings or simply to award benefits is within the discretion of the court.   *McAllister*

19  *v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).   "If additional proceedings can remedy defects in

20  the original administrative proceedings, a social security case should be remanded.   Where,

21  however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is

22  appropriate."   *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859

23  F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no

24  useful purpose would be served by further administrative proceedings, or where the record has

25  been thoroughly developed").   The Court will discuss the remedy at the end of this opinion.

26      Here, no useful purpose would be served by further administrative proceedings.   The

27  evidence demonstrates that Plaintiff had full exertional capacity, was limited to simple and

28

1   repetitive work and was unable to relate appropriately to other individuals.  The VE testified that

2   the world of work is closed to a person with these limitations.  AR 399-400.

3     Further, based on all of the functional limitations outlined by Dr. Barnett, the VE testified

4   that the world of work is closed to an individual who is able to understand, carry out and

5   remember simple instructions, but who would have difficulty responding appropriately to co-

6   workers, supervisors and the public in a routine work setting, would have difficulty responding to

7   usual work situations or stressors in an appropriate fashion, would have difficulty dealing with

8   changes in a routine work setting, would be unable to work an eight hour workday, would be

9   unable to attend work regularly, and would be unable to perform work duties consistently

10  without special or additional supervision.  AR 400.  Accordingly, Plaintiff's functional

11  limitations, as described by Dr. Barnett, render the world of work closed to her.  Therefore,

12  pursuant to the VE testimony, Plaintiff should have been found disabled.  No additional evidence

13  is necessary and therefore further proceedings would serve no purpose.

14  **RECOMMENDATION**

15    Based on the foregoing, the Court finds that the ALJ's decision is not supported by

16  substantial evidence in the record as a whole and is not based on proper legal standards.

17  Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision

18  of the Commissioner of Social Security be GRANTED, that the Commissioner's decision be

19  REVERSED and that Plaintiff be AWARDED BENEFITS.  The Court further recommends that

20  JUDGMENT be entered for Plaintiff Gina Marquez and against Defendant Michael J. Astrue.

21    These findings and recommendations will be submitted to the Honorable Lawrence J.

22  O'Neill pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fifteen (15) days after

23  being served with these findings and recommendations, the parties may file written objections

24  with the court.  The document should be captioned "Objections to Magistrate Judge's Findings

25  and Recommendations."  The parties are advised that failure to file objections within the

26  specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d

27  1153 (9th Cir. 1991).

28

22

IT IS SO ORDERED.

Dated:     **February 28, 2008**                    **/s/ Gary S. Austin**
                                                        UNITED STATES MAGISTRATE JUDGE